UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LAWRENCE LESSIG,<br><br>      Plaintiff,<br><br>v.<br><br>THE NEW YORK TIMES COMPANY,<br>ELLEN POLLOCK, DANIEL PAQUET,<br>and NELLIE BOWLES,<br><br>      Defendants. | Civil Action No.: |

## **COMPLAINT AND DEMAND FOR TRIAL BY JURY**

### Introduction

1. This is a case about Defendants' publication of a sensationalized, false and defamatory "clickbait" Internet headline and lede in order to drive readers to their story and web site. In the midst of the Jeffrey Epstein human trafficking scandal, perhaps the most horrific and widely publicized pedophile scandal in American history, Defendants falsely published a headline and lede to a story of and concerning Plaintiff, Harvard Law School Professor Lawrence Lessig ("Lessig"), which represented to their readers that Professor Lessig was defending the clandestine acceptance and retention of money from Epstein by institutions of higher learning. More specifically, on September 14, 2019 Defendant, The New York Times Company (the "NY Times"), one of the most recognized news outlets in the world with an international reach spanning to 150 million monthly global readers, published the headline: "**A Harvard Professor Doubles Down: If You Take Epstein's Money, Do It in Secret.**" Defendants followed their

1

headline with the lede: "[Lessig] **defend[s] soliciting donations from the convicted sex offender Jeffrey Epstein.**"

2. Defendants' story was met with mass outrage from campuses in Cambridge and Somerville, in Lessig's nationwide social media following, by countless victims of sexual assault, and in the infinite depths of the "Twittersphere." Within hours, Lessig became associated with the notoriety surrounding the Epstein scandal, and the community that quietly or silently tolerated such monstrosity.

3. Defendants' story was based upon an essay that Lessig had published on Medium and two interviews conducted with Lessig. Defendants published their headline and lede despite their both being the *exact opposite* of what Lessig had written and despite being told expressly by Lessig pre-publication that they were contrary to what he had written. When Lessig brought the matter to Defendants attention post-publication, they refused to remove or edit their headline or lede to reflect the truth.

4. Lessig is a nationally prominent professor and legal scholar with a large social media following. At the time Defendants published their false and defamatory story he was poised to spearhead a national dialogue dedicated to developing best standards applicable to the acceptance and retention of donations from individuals and corporations who engage in wrongdoing. Defendants' publication of their false and defamatory headline and lede has destroyed those efforts and has harmed Lessig's reputation more generally.

5. Defendants' actions here are part of a growing journalistic culture of *clickbaiting*: the use of a shocking headline and/or lede to entice readers to click on a particular article, irrespective of the truth of the headline. Defendants are fully aware that many, if not most, readers never read past the clickbait and that their takeaway concerning the target of the headline is limited to what

they read in the headline. As a result, the use of this tactic represents a uniquely troubling media practice as it relates to the harm to and destruction of the reputation of the target of the clickbait.

## The Parties

6. Lessig is an individual residing in Brookline, Massachusetts. He is a renowned legal theorist and activist, most known for his contribution to intellectual property and copyright law as well as the study of democracy. Most recently, as the Roy L. Furman Professor of Law and Leadership at Harvard Law School, his work has focused on "institutional corruption," including the corruption of Congress and the media. Highly decorated in his field, he has received national recognition as one of "Scientific American's Top 50 Visionaries," among other prestigious distinctions.

7. Defendant The New York Times, is a New York corporation with its principal place of business in New York, New York. As a global media organization, the Times has 4.7 million subscriptions and over 150 million monthly global readers. In 2018, NYTimes.com had an estimated monthly average of approximately 94 million online visitors in the United States and 134 million online visitors globally.

8. Defendant Ellen Pollock ("Ms. Pollock") is an individual who resides in New York, New York. At times material hereto, Ms. Pollock was the Business Editor at the Times and acted within the scope of her employment at the Times in reviewing, and ultimately approving the headline of the article at issue here.

9. Defendant Dean Baquet ("Mr. Baquet") is an individual who resides in New York, New York. At times material hereto, Mr. Baquet was the Executive Editor of the New York Times.

10. Defendant Nellie Bowles ("Ms. Bowles") is an individual who resides in New York, New

York. At times material hereto, Ms. Bowles was a reporter for the Times and acted within the scope of her employment at the Times in writing the article at issue here.

## Jurisdiction and Venue

11. The subject matter jurisdiction of this Court is properly based upon the presence of a a federal question related to the First Amendment of the United States Constitution, and the existence of complete diversity between the parties and an amount in controversy which exceeds $75,000.00, exclusive of costs and interest pursuant to 28 U.S.C. § 1331, § 1332. Personal jurisdiction over Defendants is lawful and proper here where Defendants each transact business in Massachusetts generally and/or engaged in tortious conduct which caused injury in Massachusetts.

12. The venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391, because a substantial part of the events or omission giving rise to the defamatory article was based on content gathered and produced in Massachusetts by Lessig. For example, Lessig gave an interview for the publication at issue from his home in Massachusetts and the content which the defamatory article discussed was derived from Lessig's article, "On Joi and MIT," which Lessig wrote and published in Massachusetts.

## Facts

13. On or about September 8, 2019, Lessig wrote an article entitled "On Joi and MIT" in which he discussed Epstein's financial contributions to MIT's Media Lab. In the article, he wrote that it was wrong for MIT to accept Epstein's money, even if anonymously, but wrong for the MIT Media Lab's director to be "scapegoated" for his mistake.

14. At the time Lessig wrote the article, Joi Ito was the Director of the MIT Media

4

Lab.

15. Concerns about Ito's role at MIT were raised when it was revealed that he had, with MIT's knowledge and approval, solicited and accepted donations from Epstein, a convicted and registered sex offender.

16. Following the revelation that Ito solicited and accepted donations from Epstein, there was a demand from some in the MIT community that Ito be fired.

17. On September 6, 2019, Ronan Farrow published an article in The New Yorker about Ito and the money Epstein had contributed to MIT. That article suggested that Ito had acted independently of MIT, and contrary to MIT's direction.

18. Farrow's article triggered new calls for MIT to fire Ito.

19. On September 7, 2019, the day after Farrow's article was published, Ito resigned his position at MIT, as well as his directorship at the NY Times.

20. On September 8, 2019, Lessig published a 3,500-word article on the website, *Medium* ("the Medium Article") that addressed the events that had led to Ito's resignation. Three days later, he added an 800-word addendum. A copy of the Medium Article and addendum are attached hereto as Exhibits A and B, respectively.

21. Lessig's Medium Article generated a large response from the public.

22. In light of the attention the Medium Article received, NY Times reporter, Ms. Bowles contacted Lessig to ask whether he would be willing to be interviewed about the article, and for the interview to be published as a "Q&A" in the NY Times.

23. On September 10, 2019, Ms. Bowles interviewed Lessig for approximately an hour. The subject of the interview was the Medium Article, and the issues of accountability and responsibility within universities.

5

24. On September 13, 2019, Ms. Bowles contacted Lessig to fact-check the article that she intended to publish.

25. Lessig and Ms. Bowles spoke for 21 minutes, as she read through her article as it was then drafted.

26. During the fact checking with Ms. Bowles, Lessig raised a number of questions about details in the article. He expressly referenced, for example, the "Addendum" and "Update" that he had added to the article since its initial publication. *See* Ex. B.

27. Specifically, Lessig raised a specific concern about any suggestion in the opening of the article that suggested he was justifying raising money from Epstein. Lessig pointed out that this was not what his article said. Ms. Bowles indicated that she understood the concern, that she agreed with Lessig, and that the incorrect language of her draft article would be corrected.

28. The NY Times published Ms. Bowles' article early in the morning on September 14. 2019. A copy of the article (the "Bowles Article") is attached hereto as Exhibit C.

29. Lessig was on an intercontinental flight and did not see the article until the early evening on the day on which it was published.

**The Medium Article**

30. The Medium Article that was the focus of the Bowles' Article had four distinct objectives.

31. First, the Medium Article revealed that Lessig had spoken to Ito at the time he was determining whether to solicit donations from Epstein. *See* Ex. A.

32. Second, the Medium Article addressed the ethics that should govern university fundraising. *See Id.*

33. The Medium Article distinguished among four kinds of donors: Type 1, referring to

money that carries no moral question; Type 2, referring to money that comes from possibly controversial commercial activities; Type 3, referring to money from people convicted of a crime; and Type 4, referring to "blood money," money earned through activities that should be morally condemned. *See Id.*

34. Lessig indicated in the article that his personal moral preference would be that universities take clean money only. *See Id.*

35. He further indicated in the article that it was his understanding that contrary to universities only accepting clean money, universities accepted contributions of all four types. *See Id.*

36. Lessig then argued in the article that if a university accepted contributions of Type 3 and Type 4, then, at a minimum, it should avoid laundering the reputation of the donors, by keeping their donation anonymous. But Lessig then made an explicit exception to that rule in the context of donations from people like Epstein. *See Id.*

37. After acknowledging that 5 years earlier he "didn't believe [Ito] was wrong to take Epstein's money anonymously," the article expressly stated Lessig's current view that taking the money "was wrong." *See Id.* As Lessig continued in the article:

> But what I — and Joi—missed then was the great risk of great harm that this gift would create. Sure, it wasn't blood money, and sure, because anonymous, the gift wasn't used to burnish Epstein's reputation. But the gift was a ticking time bomb. At some point, it was destined to be discovered. And when it was discovered, it would do real and substantial pain to the people within the Media Lab who would come to see that they were supported in part by the gift of a pedophile. That pain is real and visceral and substantial and not taken seriously enough. And every bit of emotion and outrage from victims that I have seen in this episode is, in my view, completely justified by the completely predictable consequence of that discovery. *See Id.*

38. In an addendum published the morning after the interview, three days before the publication, and pointed out to Ms. Bowles during her alleged fact-check, Lessig expanded on this point writing as follows:

7

But then the point of the paragraph beginning "But what I — and Joi — missed" is to say that *even if* you take Type 3 *and* you take them anonymously, it is a mistake to take *this particular type of* Type 3 contribution — precisely because of the pain it would cause if it were eventually revealed. Maybe you can take the money of a tax fraud, again, if and only if anonymous. But the kind of pain triggered here means that that general rule should not apply here. Which again is why I said I believe it was a mistake to take this money, *even if* anonymous. *See Id.*

39. Third, the article then concluded (and repeated in the addendum) by considering the consequences of these acknowledged wrongs:

> *That* balance, so many have so quickly concluded, yields the result that Joi must go. And so is he gone.
>
> MIT is less now that Joi is gone. I suspect even his most vocal critics recognize as much. So is what MIT lost worth what "the cause" has gained?
>
> As an unavoidable supporter of that cause, I can't believe it is.
>
> And in the addendum:
>
> I've described three mistakes: (1) I was wrong in my advice to Joi. (2) Joi was wrong in his decision to accept this kind of Type 3 money. (3) MIT was wrong to permit Type 3 money in general, and this particular contribution in particular. My only criticism of anything that's happened is that the attention and energy these mistakes have triggered is not appropriately balanced. *See* Ex. B.

40. Finally, the article lamented the character of the current social and technical context, that made it so difficult to address subtle and complex questions effectively. "Can we," the article asks, "deal with any complicated issue, sensibly? Or humanely? Or with integrity?" *See* Ex. A.

### The Defamatory NY Times Article

41. On September 10, 2019, at 4 pm EST, Ms. Bowles conducted a Q&A with Lessig by telephone. The call lasted approximately an hour. It is Lessig's belief that the call was recorded by Bowles.

42. The call focused exclusively upon the Medium Article and the issues it raised.

43. Throughout the call, Lessig repeatedly insisted that Ito was wrong to solicit

8

contributions from Epstein.

44. Throughout the call, Lessig repeatedly insisted that MIT knew of Ito's fundraising activities and approved them.

45. Lessig explained his Medium Article, not as a defense of Ito or MIT, but as an attack on the scapegoating of Ito.

46. Lessig explicitly distinguished between cases of Type 3 contributions that could be taken, if anonymous, and Epstein's money, which should *not* have been taken, *even if* anonymous.

47. Three days later, Ms. Bowles called Plaintiff to fact-check her article. At the time, Lessig was in Berlin.

48. Ms. Bowles read the narrative portion of her article as it then was drafted to Lessig.

49. After reading the initial portion of the article, Lessig raised the concern that the lede (as it was then) falsely suggested that he was defending Ito's fundraising from Epstein. Lessig insisted that was a false description of what he had written and what he believed. He stated explicitly that he was not defending taking money from Epstein. Ms. Bowles indicated she understood the point and would correct her article.

50. Lessig also suggested that the Ms. Bowles' article reflect the fact that MIT had, since the interview, acknowledged that it knew and approved of Ito's fundraising — precisely the question raised by the Farrow article in The New Yorker. As this failure by MIT to take responsibility was a primary motivation for writing the piece, this change was critical to any understanding of the matter.

51. The Bowles Article allegedly fact-checked was materially different from the article

9

that Defendants published. The final article with its title displayed a reckless disregard for the truth. *See* Ex. A.

### The NY Times Publishes Clickbait Over Fact

52. Upon publishing the Bowles Article, the NY Times tweeted:

> Lawrence Lessig, a Harvard Law professor, spoke with our reporter, Nellie Bowles, about Jeffrey Epstein, Joi Ito, MIT and reputation laundering
>
> And the clickbaiting headline:
>
> **A Harvard Professor Doubles Down: If You Take Epstein's Money, Do It in Secret.**

A copy of the tweet is attached hereto as Exhibit D (emphasis supplied).

53. Upon reading the Bowles Article, Lessig wrote to Ms. Bowles to object to the false statement in the lede:

> You know that I wish you had more power over your editors, however. That opening — which was different from what we discussed, and even that we discussed changing — is just plainly not true. It says that I am "defend[ing] soliciting donations from the convicted sex offender Jeffrey Epstein." But as we explicitly discussed, the whole point of my mea culpa was to say that — even if you take Type 3 money anonymously — you can't "defend soliciting donations from the convicted sex offender Jeffrey Epstein." So whatever else I was doing or not doing in the piece, I was certainly not "defend[ing] soliciting donations from the convicted sex offender Jeffrey Epstein." As I said, explicitly, it was a mistake to take the money from Epstein.

A copy of this correspondence is attached hereto as Exhibit E.

54. On September 15, 2019, Ms. Bowles responded:

> Larry, sorry was going to write back to you today. In the interview you explain your position a ton, unambiguously and clearly. You do not think this donation should be taken at all. That's there!
>
> But the article was defending someone who took the donations and defending him for taking them. Though of course with all the complexity in mind. Which is in the piece!

10

55. Lessig responded to Ms. Bowles immediately:

> It's true, "that's there."
>
> But in the lede of your article (which we know, is 90% of what an audience understands), you have been rendered as saying that I am "defend[ing] soliciting donations from the convicted sex offender Jeffrey Epstein." No doubt, someone reading carefully and fully would wonder how I could be "defend[ing] soliciting donations" while at the same time criticizing "soliciting donations from the convicted sex offender Jeffrey Epstein." This is different from the point I made about the world I wish we lived in — where none of this was taken. My point is that in this world, I was saying that it was **wrong** to solicit donations from Epstein. And therefore, it is wrong that the lede of your articles says that I was "defend[ing] soliciting donations from the convicted sex offender Jeffrey Epstein."
>
> See Ex. E.

56. On September 18, 2019, Lessig again raised his objection to the false statements in the Bowles Article in an email to Mr. Baquet, the Executive Editor of the NY Times. A copy of this correspondence is attached hereto as Exhibit F.

57. Two days later, Ms. Pollock, Managing Editor of the NY Times, replied by attempting to justify the publication, and declining to change the false and defamatory title and lede. As she wrote:

> it seems clear to us that you did defend Mr. Ito's actions in soliciting money from Epstein and you did say that if a university is going to take money from someone like Epstein, it's better to do so anonymously. See Id.

### The Aftermath Of The Defamatory NY Times Article

58. Readers of the NY Times article were misled into believing something that Defendants knew prior to publication was plainly false — that Lessig was "defend[ing] soliciting donations from Jeffrey Epstein" and was arguing that it was okay to take Epstein's money if the contribution was secret. The false statements cast Professor Lessig in a negative and defamatory light to all readers. See Ex. C and D.

59. Some of the responses to the NY Times publication on Twitter included:

> Twitter user 1 stated: I guess he doesn't think men should beat their wives but if they do they damn well better make it anonymous. What a bad article. They hid it because they wanted the [money]. A solution to reputation laundering could be a "Money begrudgingly accepted from really bad people" plaque.

> Twitter user 2 stated: So Ito thought Epstein would no longer be "sleeping with—trying to seduce" 14 and 16-year olds. Its's not seduction. It's Rape. Now we know what Lessig really thinks of pedophilia. Wish @NellieBowles had pushed him on this wretched misogyny

> Twitter user 3 stated: …HOW CONVENIENT to find an ethically acceptable means to take [money] anonymously.

A copy of these tweets is attached hereto as Exhibit G.

60. The effects on Lessig's reputation have been pervasive and continuing, especially given his work in the very area institutional integrity and ethics.

61. On October 10, 2019, a reporter at the NY Times, who had previously been in discussions about excerpting Lessig's forthcoming book about institutional ethics in an edition of the Sunday Times, informed Lessig that his editor had vetoed the piece and would not publish the book excerpt as a result of the story. The editor stated that, in light of the Bowles article, Lessig was being hypocritical in writing about institutional corruption.

62. As a result of the NY Times' defamatory statements and use, Lessig has suffered significant and irreparable damage to his reputation and profession, as well as emotional distress, embarrassment and humiliation.

## COUNT I -- DEFAMATION

63. Lessig realleges and incorporates herein by reference each of the prior paragraphs.

64. Defendants published, and continue to publish, their false and defamatory article of and concerning Lessig with a knowing and reckless disregard of the truth and thereby caused and

continue to cause Lessig damages. Defendants compounded their wrongdoing by continuing to publish their defamatory article even after they were explicitly noticed that the clickbait and lede were essentially a knowing fabrication given the facts Lessig provided prior to publication.

65. In so doing, Defendants' false and defamatory statements subjected Lessig to ridicule and scorn, sabotaging his well-respected name, reputation, and academic work. The consequences of this clickbaiting have been harmful to Lessig and his work.

66. Defendants are liable in damages to Lessig.

WHEREFORE, the plaintiff, Professor Lawrence Lessig, respectfully requests that the Court grant him the following relief:

   i.   after trial, enter judgment on Count I in his favor and award him damages in the
   ii.  amount assessed by the jury, including fees, costs, and interest; and
   iii. grant such other further relief as the Court deems just and proper.

### Jury Demand

Plaintiff hereby demands a trial by jury on all claims so triable.


PROFESSOR LAWRENCE LESSIG

By his attorney,

/s/ *Howard M. Cooper*
Howard M. Cooper (BBO # 543842)
hcooper@toddweld.com
Tara D. Dunn (BBO # 699329)
tdunn@toddweld.com
Todd & Weld LLP
One Federal Street, 27th Floor
Boston, MA 02110
(617) 720-2626

Dated: January 13, 2020